In the District Court of the United States
For The District of South Carolina
CHARLESTON DIVISION

RECEIVED
USDC CLERK, CHARLESTON, SC

2007 NOV 27  A 7: 34

| | | |
|---|---|---|
| **CHERYL A. STEVENS,** | ) | C.A. No. 2:06-3123-GRA-GCK |
| | ) | |
| Plaintiff, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| vs. | ) | **OF THE MAGISTRATE JUDGE** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I. INTRODUCTION

This case is before the Court pursuant to Local Civil Rule 83.VII.02(A), D.S.C.,

concerning the disposition of Social Security cases in this District, and Title 28, United States

Code, Section 636(c).  The plaintiff, Cheryl A. Stephens (the "Plaintiff" or "Claimant"), has

bought this action pursuant to Section 205(g) of the Social Security Act, as amended, 42

U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social

Security (the "Commissioner") that Plaintiff's entitlement to disability income benefits under

the Social Security Act had ceased as of October 2003.  The only issues before the Court are

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted for Commissioner Jo Anne B. Barnhart as the defendant in this action.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

whether the findings of fact are supported by substantial evidence and whether proper legal standards were applied.

## II.  BACKGROUND TO THE CASE

The Plaintiff was born on November 25, 1968.  (Tr. 30)  On December 17, 1999, the Plaintiff filed an application for Disability Insurance Benefits ("DIB") under sections 216 and 223 of Title II of the Act, 42 U.S.C. §§ 416(i), 423.  (Tr. 38)[2]  In a decision dated July 6, 2001, following a hearing before an Administrative Law Judge ("ALJ"), Plaintiff was found disabled as of February 16, 1999 and awarded a period of disability and DIB.  (Tr. 34-43).  Following a continuing disability review, Plaintiff's disability was determined to have ceased as of October 2003.  (Tr. 15; 45-47).  The decision was affirmed on reconsideration.  (Tr. 50-58)  Pursuant to Plaintiff's request, a hearing de novo was held before ALJ Francis F. Talbot on March 23, 2006, at which Plaintiff and her attorney, Phoebe Jenkins, appeared.  (Tr. 442-453).  ALJ Talbot issued a decision on May 5, 2006, finding that Plaintiff's disability had ceased as of October 2003.  (Tr. 12-23)  On September 8, 2006, the Appeals Council denied Plaintiff's request for review of the hearing decision (Tr. 6-10), making the ALJ's decision the Commissioner's final decision.  Plaintiff, proceeding *pro se* and *in forma pauperis*, has sought judicial review of the Commissioner's decision in a Complaint filed on November 2, 2006, pursuant to section 205(g) of the Act, 42 U.S.C. § 405(g).

## III.  EVIDENCE BEFORE THE ALJ

### A.  The July 6, 2001 Determination

---

[2]    Plaintiff's Application for benefits is not contained in the record.

On July 6, 2001, an ALJ found that Plaintiff was disabled. (Tr. 34-43)  At that time, Plaintiff had the following severe impairments:  disc herniations at L4-6, C-7, and T-1; bladder problems; and psychological problems secondary to her physical condition. (Tr. 41) The ALJ found Plaintiff's complaints were credible and that she retained the residual functional capacity ("RFC") to perform less than sedentary work on a sustained basis. (Tr. 41)

### B.  Medical evidence from July 6, 2001, to November 3, 2003

Evidence relevant to Plaintiff's condition since July 6, 2001 indicates as follows:  An October 30, 2001, MRI of the lumbar spine revealed diffuse disc bulging at L4-5 resulting in mild bilateral neural formanial stenosis. (Tr. 182)  X-rays taken in February 2002 were normal for the thoracic spine, pelvis, chest and left wrist, and revealed disc space narrowing of the lumbar spine at L5-S1. (Tr. 185-86)  On April 5, 2002, Plaintiff underwent a chest x-ray, which had been indicated by multiple drug overdose and chest discomfort; the x-ray revealed no definite evidence of edema or infarction. (Tr. 178).  She also had an x-ray of the abdomen, which was indicated by multiple drug overdose and abdominal distension. (Tr. 179)  The x-ray revealed no disease. (Tr. 179)  An x-ray of the left hand was also normal. (Tr. 180)  A June 2002 bone scan was normal. (Tr. 184)



On June 24, 2002, Plaintiff reported to Leland Stoddard, M.D., complaining of low back and right buttock and leg pain. (Tr. 200)  She complained of weakness in her lower extremities and had pain of nine on a scale of one to ten. (Tr. 200)  Examination revealed some tenderness in her back and a straight leg raising test was "equivocal." (Tr. 200)  In addition, Plaintiff had some sensory loss. (Tr. 200)  Dr. Stoddard noted that an MRI of the

spine revealed mild degenerative disc disease. (Tr. 201) He recommended an EMG. (Tr. 201) Charles J. Nivens, M.D. conducted the EMG in July 2002 and treated Plaintiff for the next seven months. (Tr. 190-99) Over the course of treatment, Plaintiff reported her symptoms fluctuated. (Tr. 190-95)

On February 7, 2003, Plaintiff returned to Dr. Stoddard complaining of bilateral knee pain and right shoulder pain. She said that she had good relief with a shoulder injection and requested another. (Tr. 385) Examination revealed full motion of the shoulder with pain only on full abduction and rotation. (Tr. 385) Examination of the knee revealed no effusion and minor patella crepitus. (Tr. 385) Dr. Stoddard administered the injection and ordered an MRI. (Tr. 385) Three weeks later Plaintiff complained of left hip pain, which Dr. Stoddard assessed as bursitis, and administered an injection. (Tr. 384) On March 13, 2003, Plaintiff underwent an MRI of the right shoulder indicated by shoulder pain and decreased range of motion. (Tr. 362) There was no evidence of a rotator cuff tear or AC joint separation. (Tr. 362) There was non-specific edema that might have reflected recent trauma. (Tr. 362) Two



weeks later, Dr. Stoddard noted that an MRI of the shoulder revealed an osteophyte formation but no rotator cuff tear. (Tr. 383) Plaintiff had full range of motion of the right shoulder. (Tr. 383) Dr. Stoddard thought Plaintiff had myofascial pain syndrome and administered an injection of Depo Medrol and Marcaine. He continued her on Soma but refused to give her narcotics. (Tr. 383)

On April 16, 2003, Plaintiff reported to Seth Kupferman, M.D., and David White, a physician' s assistant, for evaluation of left shoulder pain. (Tr. 240) Examination revealed left shoulder atrophy with slight limitation of motion and positive impingement. (Tr. 240)

Dr. Kupferman noted that Plaintiff gave sub-maximum effort on the strength testing. (Tr. 240) X-rays were normal. (Tr. 240). Dr. Kupferman's assessment was atypical shoulder pain with mild rotator cuff tendonitis and evidence of mild tendonopathy. (Tr. 240) He recommended and administered a cortisone injection and prescribed physical therapy. (Tr. 240)

On April 29, 2003, Dr. Stoddard canceled a prescription for Soma for Plaintiff because the office had learned through CVS pharmacy that Plaintiff had received a prescription for 120 Darvocet from Dr. Nivens. (Tr. 383)

In May 2003, Plaintiff reported to the emergency room complaining of back pain radiating to her right hip and right leg. She reported that Dr. Nivens had given her a nerve root block two days before. (Tr. 202) She also said she had been given medication administered by a patch, but that the patch would not adhere to her skin. (Tr. 202) Examination revealed pain in her lower spine and pain when she moved her right leg. She was discharged with medication and instructions to follow-up as needed. (Tr. 203)

On June 17, 2003, Plaintiff followed-up with Dr. Kupferman and reported a good response to the injection. She said she had started physical therapy. She said she was using a shoulder sling, even though Dr. Kupferman recommended that she not use one. Examination revealed good motion and tenderness in the left arm. He recommended conservative treatment. (Tr. 239)



On June 20, 2003, Plaintiff failed to show for her appointment with Dr. Stoddard. (Tr. 383)

Plaintiff sought mental health treatment from Douglas Crane, M.D., from June 2003 to

March 2004. (Tr. 252-315) In the beginning, there were notes indicating that Plaintiff had symptoms of anxiety and depression. (Tr. 311) On July 7, 2003, Plaintiff returned to Dr. Stoddard complaining of hip pain. She had tenderness over the hip and received an injection of Depo Medrol and Marcaine. (Tr. 382)

Plaintiff returned to Dr. Kupferman in August 2003. (Tr. 239) Examination revealed good range of motion in the left shoulder and "exquisite" tenderness about the base of the left neck and trapezius, and Dr. Kupferman administered another cortisone injection. (Tr. 239) A week later, Plaintiff returned complaining of left hip pain. Examination revealed full range of hip motion and mild pain and x-rays were normal. (Tr. 238) Dr. Kupferman's assessment was bursitis. (Tr. 238) He administered another injection. (Tr. 238)

Plaintiff reported to Leonard Forrest, M.D., at Southeastern Spine Institute on August 20, 2003. (Tr. 204) Dr. Forrest noted that he had last seen Plaintiff in June 2000, when he recommended that she go to physical therapy. (Tr. 204) Plaintiff told him that she sustained an injury in August 2001. (Tr. 204) She claimed she had problems with anemia and edema, and had some mental problems. Examination revealed tenderness in the back and give way to resistence in the upper and lower extremities that seemed secondary to pain. Dr. Forrest noted that x-rays revealed minor degenerative changes. (Tr. 205) He also noted that Plaintiff had complaints of pain involving the neck, upper back, upper extremities, low back and right shoulder. (Tr. 205) Dr. Forrest recommended an MRI of the cervical and lumbar spine. (Tr. 205)



On September 29, 2003, Plaintiff reported to Harriet Steinert, M.D., for a vocational rehabilitation examination. Plaintiff would not answer Dr. Steinert's questions, claiming she

had a migraine headache. She would not cooperate with the physical exam and displayed exaggerated tenderness to palpation of the trapezius muscles and the neck. (Tr. 206) She said she could not raise her arms or move her legs, or bend any joints. (Tr. 206) She made no effort to grip Dr. Steinert's hands. (Tr. 206) Dr. Steinert wrote that Plaintiff was difficult to evaluate and that it was "impossible to differentiate what [was] real from what [was] not". (Tr. 206) She thought it probable that Plaintiff had significant psychiatric problems which, if resolved, might show that Plaintiff did not have neck and back impairments. (Tr. 206-07) Dr. Steinert stated "This patient needs an extensive neurological and psychiatric evaluation." (Tr. 207)

On October 3, 2003, Plaintiff reported to Anil Juneja, M.D., for a consultative psychological evaluation. (Tr. 209-11) Dr. Juneja noted that the medical records indicated Plaintiff had a personality disorder and Munchausen syndrome. (Tr. 209) Plaintiff reported she was taking pain medication as well as anti-anxiety and anti-depression medication. (Tr. 209) Plaintiff walked with a cane, had a neck collar, had a left shoulder brace, walked slowly, stooped forward, appeared to be in pain and was tearful during the examination. (Tr. 210) She was fully alert and oriented. (Tr. 210) She displayed mild psychomotor retardation and concentration difficulties. (Tr. 210) Her memory functions appeared to be excellent. (Tr. 210) There was no evidence of psychosis. (Tr. 210) Insight was limited and judgment was fair. (Tr. 210) She was able to do simple calculations. (Tr. 210) She could not spell "house" and spelled "nursing" with an abbreviation. (Tr. 210) She said "5+5" was seven, but when confronted, said it was ten. (Tr. 210) Dr. Juneja's impression was depressive disorder and factitious disorder, and personality disorder, as documented in the medical records. (Tr. 211)

Dr. Juneja did not have enough information to diagnose a personality disorder, as Plaintiff said she had no interpersonal difficulties. (Tr. 211)

A week later, Plaintiff was discharged by her physical therapist, whom she saw for treatment of rotator cuff tear, tendonitis and shoulder pain. (Tr. 212) The physical therapist 7 noted that he had seen Plaintiff 13 times from May to July 2003, but that Plaintiff had not returned. (Tr. 212) Plaintiff had said that she was able to perform her activities of daily living. (Tr. 212) The therapist had questions about Plaintiff's compliance with treatment. (Tr. 212)

On October 17, 2003, a State agency physician reviewed Plaintiff's medical records and assessed her RFC. (Tr. 214-20) The physician thought Plaintiff could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; sit about six hours in an eight-hour workday; stand about six hours in an eight-hour workday; occasionally climb, balance, stoop, kneel, crouch and crawl; and that she had no manipulative, visual, communicative or environmental limitations. (Tr. 214-17) The physician thought that Plaintiff's complaints were disproportionate to the expected severity of her impairments. (Tr. 218)

On August 20, 2003, Douglas F. Crane, M.D. of Lowcountry Psychotherapy Associates, P.A. stated that Plaintiff had been under his care since June 9, 2003 and he opined that Plaintiff was not stable enough to be her own counsel in criminal proceedings. (Tr. 282) He noted that she had difficulty recognizing and managing her affects, so that her responses "miss the mark". Her trust in others was low, and the heightened stress of an adversarial process could cause further emotional decompensation. (Tr. 282)

On October 31, 2003, Plaintiff returned to Dr. Kupferman complaining of bilateral ankle pain. (Tr. 237) Examination was normal, as were x-rays. (Tr. 237) Dr. Kupferman recommended conservative treatment. (Tr. 237) A week later, upon re-examination, Dr. Kupferman's assessment was bilateral ankle and foot pain with nebulous origin. (Tr. 236) He continued to recommend conservative treatment. (Tr. 236) Four days later, Plaintiff called, complaining of pain in her knees. (Tr. 236) The next day, Dr. Kupferman noted that Plaintiff ambulated into the clinic, but then was in a wheelchair and claimed she was unable to walk. (Tr. 235) Plaintiff climbed on the examination table. (Tr. 235) Examination revealed pain upon manipulation of the patella and tenderness on palpation to the knees. (Tr. 235) Sensation was intact, although Plaintiff complained of diminished sensation in her feet. (Tr. 235) X-rays were normal. (Tr. 234) Dr. Kupferman's assessment was bilateral knee pain. He noted that Plaintiff cried during the examination and that he suspected that her pain might be related to depression. He administered cortisone injections to both knees and recommended physical therapy. (Tr. 234).

### C. Medical evidence dated after the date disability ceased

On November 17, 2003, Plaintiff reported to John McFadden, M.D., complaining that she had sprained her wrists. (Tr. 225) Plaintiff said she had been assaulted on October 3, 2003 (the day she was examined by Dr. Juneja). (Tr. 225) Dr. McFadden saw no evidence of an orthopaedic injury and recommended range of motion exercises. (Tr. 225) He noted that Plaintiff wore wrist splints and recommended that she discontinue using them. (Tr. 226)



On November 19, 2003, Plaintiff returned to Dr. Kupferman. (Tr. 233) He noted that she was ambulating independently with occasional assistance. (Tr. 233) She said her knee

felt better, but that still had significant pain. Dr. Kupferman administered an injection. (Tr. 233)

A January 19, 2004 MRI of the cervical spine revealed mild spondylosis and degenerative disc disease with mild disc bulges and a mild disc protrusion at the C5-6 level. (Tr. 358-60) An MRI of the lumbar spine demonstrated mild compression fractures of the L1, L2, and L3 vertebral bodies and a disc protrusion at L4-5. (Tr. 354-56) On February 6, 2004, Plaintiff reported to William Wilson, M.D. (Dr. Kupferman's colleague) complaining of back pain after falling off a ladder or a step stool in December 2003. (Tr. 232) She ambulated with canes on each side. (Tr. 232) Examination revealed tenderness across the spine, and an MRI revealed a possible compression fraction at L1-2-3. (Tr. 232) Dr. Wilson noted that Plaintiff had called in repeatedly for pain medication and he told her that he was not treating her for chronic pain. (Tr. 231)



On February 18, 2004, Dr. Wilson refused to prescribe narcotic pain medication and commented that Plaintiff was "very manipulative." (Tr. 231) On February 23, 2004, Plaintiff reported to J. Edward Nolan, M.D., at the Trident Pain Center, complaining of sharp pain in the neck, shoulders, mid back, lower back and both legs. (Tr. 428) Examination revealed severe pain and tenderness in the back and severe bilateral lumbar radiculitis in the L5 nerve distribution. (Tr. 428) Dr. Nolan's assessment was radiculitis and neuritis of the thoracic and lumbar spine. He recommended conservative treatment. (Tr. 428) On February 27, 2004, Plaintiff's physicians noted that she had been arrested for drug abuse. (Tr. 230)

From April 5 to April 28, 2004, Plaintiff was hospitalized at the G. Werber Bryan Psychiatric Hospital after she tried to strangle herself with some hair extensions. (Tr. 317-50)

Page 10 of 28

She was referred from Charleston Metal Health Center. Michael Kirby, M.D., authored the discharge note. (Tr. 317-19) He opined that Plaintiff was believed to be manipulative and causing some "facetious illnesses" that would get her out of incarceration. (Tr. 317) He noted that Plaintiff had "bonafide back problems" and had been depressed. (Tr. 318) She had been "tenacious" in getting treatment and/or medications, to the point that her physicians had to obtain a restraining order. (Tr. 318) When she was told she was being released from the hospital and would likely return to the Charleston County Detention Center, she said that "she would simply fall on the floor and crack her head open," which Dr. Kirby thought was consistent with her problems at the previous mental health facility. (Tr. 318) He did not believe that Plaintiff's proneness toward self-harmful behavior was due to a major psychiatric illness, but rather due to her desire to avoid incarceration. (Tr. 318) The discharge diagnoses were dysthymic disorder, facetious disorder and borderline personality disorder (primary diagnosis), with a GAF of 65[3] upon discharge and over the past year. (Tr. 318)

On April 27, 2004, Dr. Crane terminated the physician/patient relationship because Plaintiff was non-compliant with keeping scheduled appointments. (Tr. 251) He recommended she seek treatment from another provider. (Tr. 251) According to Plaintiff, she could not see Dr. Crane because she had to drive 130 miles round trip, and it was hard on her and her family. (Tr. 438)



---

[3]    A Global Assessment of Functioning ("GAF") code between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) 32 (4th ed. 1994).

On June 9, 2004, Plaintiff reported to Dr. Stoddard complaining of polyarthalgias, primarily in the right shoulder, hips and knees. (Tr. 380)  Examination of the knees revealed some tenderness on the right, and examination of the hip revealed moderate tenderness. (Tr. 380)  Dr. Stoddard administered an injection in Plaintiff's shoulder and ordered a bone scan. (Tr. 381)  A July 2004 MRI of the right shoulder revealed increased inflamation and bursal distention, but no undersurface spurring or rotator cuff abnormality. (Tr. 351)  Testing was consistent with joint bursitis. (Tr. 351)  After viewing the MRI scan, Dr. Stoddard's assessment was chronic impingement syndrome of the right shoulder, and he recommended an arthroscopy which he performed on July 29, 2004. (Tr. 366, 374)  In his examination notes on the day of the arthroscopy, Dr. Stoddard wrote that he had followed Plaintiff "for multiple musculoskeletal complaints, all of which have proved largely spurious.  She relate[d] histories of several times being beaten up by police officers or security personnel on multiple different occasions. . . . She denie[d] any surgical history." (Tr. 366)

In the meantime, Plaintiff had returned to Dr. Nolan on July 20, 2004, for follow-up care of her back pain. (Tr. 426)  Dr. Nolan administered an injection. (Tr. 426)  On August 3, 2004, Plaintiff reported to Dr. Nolan, again complaining of back pain. (Tr. 424)  Examination revealed pain and tenderness in the back; Dr. Nolan's assessment was thoracic and lumbar facet arthropathy.  He administered an injection and recommended conservative treatment. (Tr. 424)

On August 17, 2004, a State agency physician reviewed Plaintiff's medical records and assessed her residual functional capacity. (Tr. 390-96)  The physician thought Plaintiff could lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; sit about six hours

in an eight-hour workday; stand about six hours in an eight-hour workday; and occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; never climb ladders, ropes and scaffolds; and had no manipulative, visual, communicative or environmental limitations. (Tr. 390-93)

On August 24, 2004, a State agency psychologist reviewed Plaintiff's medical records and completed a Psychiatric Review Technique Form. (Tr. 397-410) The psychologist noted that Plaintiff had an affective disorder and a personality disorder that caused moderate restrictions of activities of daily living; difficulties in maintaining social functioning; difficulties in maintaining concentration, persistence or pace; and one or two episodes of decompensation. (Tr. 397, 400, 404, 407) She noted that many of Plaintiff's "maladaptive behaviors appear[ed] to be due to personality disorder and to willful attempts to avoid consequences of her behavior. At this point, work-related limitations would be no more than moderately severe." (Tr. 409) The psychologist also completed a Mental Residual Functional Capacity Assessment, finding that Plaintiff was moderately limited in her ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; complete a normal workday or workweek without interruption; and interact appropriately with the general public. (Tr. 415-16) She further indicated that Plaintiff had the ability to perform other work-related activities. (Tr. 415-17)

On March 22, 2006, someone (the signature is illegible) wrote on health clinic stationery that he had been "following" Plaintiff for one and one-half years. (Tr. 430) He stated that Plaintiff had multiple hospital admissions and was status post back surgery two

months before. (Tr. 430) He wrote that she suffered from chronic pain syndrome and needed to use a walker and a cane. (Tr. 430) In addition, he opined that Plaintiff had significant psychological issues and was disabled. (Tr. 430) Also on March 22, 2006, Dr. Wilson opined that Plaintiff had chronic central pain syndrome and needed chronic pain management at a pain center. (Tr. 431) He thought it was unlikely that Plaintiff would be able to work in any capacity. (Tr. 431)

### D. Testimony by Plaintiff

Plaintiff testified that she had last worked in February 1999 as a registered nurse. (Tr. 445) She lived in Walterboro with her husband and three children. (Tr. 445) Plaintiff said that her main problem was constant pain in her back, neck and shoulders, elbow tendon pain, joint pain, and wrist pain. (Tr. 446-447) She also had severe dizziness every three months. (Tr. 452) She described her pain as an eight or a nine, on a scale of zero to ten, with ten being the worst. (Tr. 451) She said she had had three surgeries on her back and a recent MRI had revealed a postoperative disc bulge. (Tr. 446) Plaintiff said she had seen Dr. Wilson the day before the March 23, 2006, hearing. (Tr. 447) She also claimed she suffered post traumatic stress syndrome and had severe insomnia, anxiety and a personality disorder. (Tr. 447) She said she had received mental health treatment on and off since 2001 (Tr. 448) and was scheduled to talk with a counselor at the Women's Center in Charleston in April. She also had been treated at the state hospital in Columbia and at MUSC's Institute of Psychiatry. (Tr. 448) Plaintiff testified that she was taking Lortab, Flexeril and Tylox, every four to six hours, for pain, and the medications made her drowsy. (Tr. 449) She had been prescribed a back brace by Dr. Wilson and had been wearing it since July 2005. (Tr. 450) She said that she was

Page 14 of 28

able to drive, but had to stop every 30 to 45 minutes because of her back.  (Tr. 449-450)  She

could sit for 30-45 minutes before she would be in pain.  She could stand.  She uses her cane

if she has to walk a short distance.  If she walks more than 500 feet, she has to use her walker.

(Tr. 452)

### E.  The ALJ's Decision

After considering all of the evidence, ALJ Talbot found in her decision dated May 5,

2006 that the Plaintiff's disability correctly ended as of October 2003.  (Tr. 23)  The ALJ

found as follows:

1.    The most recent favorable medical decision finding that the claimant was disabled is the decision dated July 6, 2001.  This is known as the "comparison point decision" or CPD.  (Tr. 17)

2.    At the time of the CPD, the claimant had the following medically determinable impairments:  herniated discs at L4-6, C6-7 and T1; bladder problems; and psychological problems secondary to her physical condition.  These impairments were found to result in the residual functional capacity to perform less than the full range of sedentary work.  (Tr. 17)

3.    Through October 2003, the date the claimant's disability ended, the claimant did not engage in substantial gainful activity (20 CFR 404.1594(f)(1)).  (Tr. 17)

4.    The medical evidence establishes that the claimant did not develop any additional impairments after the CPD through October 2003.  (Tr. 17)

5.    As of October 2003, the claimant did not have an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).  (Tr. 17)

6.    Medical improvement occurred as of October 2003 (20 CFR 404.1594(b)(1).  (Tr. 17)



7.    After careful consideration of the entire record, the undersigned finds that, as of October 2003, the claimant had the residual functional capacity to:  sit for 6 hours of an 8-hour day; stand/walk for 2 hours of an 8-hour day; frequently life/carry light items; and occasionally lift 10 pounds.  (Tr. 18)

8.    The claimant's medical improvement is related to the ability to work because it resulted in an increase in the claimant's residual functional capacity (20 CFR 404.1594(c)(3)(ii)).  (Tr. 22)

9.    As of October 2003, the claimant's impairments were severe (20 CFR 404.1594(f)(6).  (Tr. 22)

10. As of October 2003, the claimant was unable to perform past relevant work (20 CFR 404.1565). (Tr. 22)

11. In October 2003, the claimant was a younger individual age 18-44 (20 CFR 404.1563). (Tr. 22)

12. The claimant has a least a high school education and is able to communicate in English (20 CFR 404.1564). (Tr. 23)

13. Transferability of job skills is not material to the determination of disability due to the claimant's age (20 CFR 404.1568). (Tr. 23)

14. As of October 2003, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was able to perform a significant number of jobs in the national economy (20 CFR 404.1560(c) and 404.1566). (Tr. 23)

15. The claimant's disability ended as of October 2003 (20 CFR 404.1594(f)(8). (Tr. 23)

## IV. SCOPE OF REVIEW

Under the Social Security Act, 42 U.S.C. § 405(g), this Court's scope of review of the

Commissioner's "final decision regarding disability benefits is limited to determining whether

the findings are supported by substantial evidence and whether the correct law was applied."

*Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). The Court's scope of review is specific

and narrow. It does not conduct a *de novo* review of the evidence, and the Commissioner's

finding of non-disability is to be upheld, even if the Court disagrees, so long as it is supported

by substantial evidence. 42 U.S.C. § 405(g); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th



Cir. 1972). "Substantial evidence" is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Teague v. Califano*, 560 F.2d 615, 618 (4th Cir.

1977). Such evidence "consists of more than a mere scintilla of evidence but may be

somewhat less than a preponderance." *Shivey v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Such evidence is generally equated with the amount of evidence necessary to avoid a directed

verdict. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). It is the duty of the ALJ

reviewing the case, and not the duty of the Court, to make findings of fact and resolve conflicts in the evidence. *Hays*, 907 F.2d at 1456. In reviewing for substantial evidence, the court does not weight conflicting evidence, make credibility determinations, or substitute its judgment for that of the agency. *Id.* If substantial evidence supports the Commissioner's decision that a claimant is not disabled, the decision must be affirmed. *Blalock*, 483 F.2d at 775.

Plaintiff bears the burden of proving that she is disabled within the meaning of the Social Security Act, 42 U.S.C. § 423(d)(5); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir.1981). A disability, as defined by the Act, is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant must demonstrate that:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. 42 U.S.C. § 423(d)(2)(A).

Continued entitlement to Social Security disability benefits must be reviewed periodically. *See* 20 C.F.R. § 404.1594(a) (2006). A claimant's disability will be found to have ended if it is shown that medical improvement related to the claimant's ability to do work has occurred, and the claimant is currently able to engage in substantial gainful activity. *See* 20 C.F.R. §§ 404.1594(a), (b)(1). Medical improvement is any decrease in the medical severity of a claimant's impairment(s) which was present at the time of the most recent

favorable medical decision that the claimant was disabled.  See 20 C.F.R. § 404.1594(b)(1).

A determination that there has been a decrease in medical severity must be based on changes

(improvement) in the symptoms, signs and/or laboratory findings associated with the

claimant's impairment(s).  *See id.*  Medical improvement is related to a claimant's ability to

work if there has been a decrease in the severity as defined in paragraph (b)(1), of the

impairments present at the time of the most favorable medical decision and an increase in the

claimant's functional capacity to perform basic work activities.  *See* 20 C.F.R. §

404.1594(b)(3).

## V.  PLAINTIFF'S OBJECTION

Whether substantial evidence supports the Commissioner's decision that the Plaintiff was not
disabled within the meaning of the Act as of November 2003.

## VI.  DISCUSSION

As mentioned above, this court's scope of review limits questions before the Court to

(1) whether the Commissioner's decision is supported by substantial evidence, and, (2)

whether the ultimate conclusions reached by the Commissioner are legally correct under

controlling law.  *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*,

907 F.2d 1453, 1456 (4th Cir. 1990).  In the present case, the administrative record firmly

supports the Commissioner's decision that as of November 2003, Plaintiff demonstrated

medical improvement related to her ability to work, and that there was other work in the

national economy that Plaintiff could perform, despite her impairments and resulting

limitations.

As of May 9, 2001, the date of the most recent favorable medical decision that Plaintiff was disabled,[4] Plaintiff was determined to have impairments that resulted in an residual functional capacity for sedentary work. (Tr. 40)  In order for the ALJ to determine whether Plaintiff's disability ceased, he had to first determine whether, by November 2003, there had been medical improvement in Plaintiff's condition relating to her ability to work. He found that there had been such medical improvement.  The ALJ first noted that Plaintiff had the following severe impairments in May 2001:  herniated discs at L4-6, C6-7, and T1; bladder problems; and psychological problems.  (Tr. 17; see Tr. 41)  He then noted that Plaintiff had no additional impairments after May 2001.  (Tr. 17)  Although Plaintiff complained of dizziness, there was no evidence in the record documenting an impairment that would cause dizziness.  *See* 20 C.F.R. § 404.1508 (a physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your symptoms).  "In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled at step 2 of the sequential evaluation

---

[4]     The earlier decision applied a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant is currently working; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in app. 1 (If so, disability is automatic.); (4) whether the impairment prevents the claimant from doing past relevant work; and finally, (5) whether the impairment prevents the claimant from doing any other work. *See* 20 C.F.R. § 404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  *See Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).  Only if the final stage is reached does the fact finder consider the claimant's age, education, and work experience in light of his or her residual functional capacity.  *See Hall*, 658 F.2d at 264; 20 C.F.R. § 404.1520.

process." Social Security Ruling (SSR) 96-4p. Further, although Plaintiff complained of neck, elbow and wrist pain, the ALJ noted that examinations revealed that these conditions were relatively benign and did not require substantial treatment. (Tr. 17; see Tr. 185-86, 205, 206, 225-26, 239, 428) The ALJ correctly concluded that these impairments were not severe. (Tr. 17) *See* 20 C.F.R. § 404.1520(c); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); SSR 96-3p; SSR 85-28.

Next, the ALJ determined Plaintiff had medical improvement in her condition and discussed each impairment in turn. He noted that since 2001, Plaintiff had not had any complaints of or treatment of her bladder problems. (Tr. 17) He then discussed Plaintiff's back problems (Tr. 17-18) and noted that the objective tests, i.e., MRIs, indicated that Plaintiff had only mild problems. (Tr. 17-18; see Tr. 182, 201, 232, 351, 354-56, 358-60, 385) With respect to Plaintiff's psychological condition, he noted that Plaintiff's attending physician during the April 2004 hospitalization, Dr. Kirby, concluded that she did not have a psychiatric illness. (Tr. 18; see Tr. 318) Further, Dr. Kirby assigned Plaintiff a GAF of 65, which indicated some mild symptoms, but generally good functioning. (Tr. 318) This constitutes substantial evidence to show that Plaintiff's impairments had improved.

Next, the ALJ had to determine whether Plaintiff's medical improvement related to her ability to work. (Tr. 22) To make this finding, the ALJ looked at Plaintiff's residual functional capacity. (Tr. 19-22); *see* 20 C.F.R. §§ 404.1594(b)(1)(i)-(iv), 5(iii). Substantial evidence supports the ALJ's conclusion that Plaintiff retained the ability to perform the full

range of sedentary work.  Although Plaintiff had "severe" impairments of the spine, the

presence of an ailment does not automatically entitle a claimant to disability benefits; there

must be a showing of related functional loss.  *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th

Cir. 1986).  In determining Plaintiff's residual functional capacity, the ALJ properly

considered Plaintiff's subjective complaints of disabling symptoms and properly concluded

that they were not credible to the extent alleged and that these complaints did not prevent her

from working.  (Tr. 15-16)  The Fourth Circuit has established a two-step analysis for

evaluating subjective complaints.  The first step requires documentation by objective medical

evidence of the presence of an underlying impairment which reasonably could be expected to

cause the subjective complaints of the severity and persistence alleged.  *See Craig v. Chater*,

76 F.3d 585, 594-96 (4th Cir. 1996); *Mickles v. Shalala*, 29 F.3d 918, 925-26 (4th Cir. 1994).

Consideration must then be given to the entire record, including objective and subjective

evidence, to assess the credibility of the severity of the subjective complaints reported.  *See*

*Craig*, 76 F.3d at 594-96; *Mickles*, 29 F.3d at 925-26.

    As the ALJ correctly noted, Plaintiff's physicians' reports did not reveal the significant

clinical and laboratory findings one would expect if Plaintiff were disabled.  For example, as

noted above, MRIs of the lumbar, cervical and thoracic spine all revealed only mild or

minimal changes or fractures.  (Tr. 182, 201, 232, 351, 354-56, 358-60, 385)  Significantly,

while Plaintiff claimed she had three back surgeries (Tr. 446), there was no evidence of those

surgeries in the record.  Similarly, while Plaintiff complained of left shoulder pain, wrist pain,

knee pain and hip pain, objective testing was negative. (see, e.g., Tr. 234, 238, 362). The ALJ's decision that Plaintiff was not disabled was well-supported by the lack of objective medical findings. *See Craig*, 76 F.3d at 590. Other evidence of record supported the ALJ's conclusion as well. For example, as the ALJ noted, medication, even nonprescription medication, was somewhat effective. (Tr. 191; *see, e.g.*, Tr. 385). Indeed, Plaintiff reported that injections had been generally successful in relieving her pain. *See Gross*, 785 2d at 1166 (a condition is not disabling if it can be reasonably controlled by medicine or treatment); 20 C.F.R. § 404.1530. Furthermore, the ALJ noted that the record suggested that Plaintiff engaged in drug seeking behaviors -- (Tr. 20)-- to the extent that at least one physician felt the need to obtain a restraining order against her. The ALJ specifically mentions that in April 2003, Dr. Stoddard canceled a prescription for Plaintiff after learning she had a prescription from Dr. Nivens. (Tr. 20; see Tr. 383). In addition, Plaintiff was not compliant when being examined. The ALJ noted that Dr. Steinert reported that Plaintiff did not cooperate (Tr. 20; see Tr. 206). *Cf. English v. Shalala*, 10 F.3d 1080, 1084 (4th Cir. 1993) (evidence that a claimant was uncooperative during testing, failed to take prescribed medication, and was poorly motivated, together with his own testimony regarding his exertional capacity, amounted to substantial evidence to support the ALJ's findings). Furthermore, examining and treating physicians questioned whether Plaintiff was exaggerating her symptoms. The ALJ noted, for example, that Dr. Steinert reported Plaintiff had exaggerated her symptoms and made no effort to grip; Dr. McFadden noted in November 2003 that, despite complaints of

diffuse hand tenderness, there was no treatable injury; Dr. Kupferman noted in April 2003 that

Plaintiff gave sub-maximum effort; in November 2003, Plaintiff complained she could not

walk into the examining room, but was able to climb on the examination table and had walked

to the clinic; and in February 2004, Plaintiff made an inconsistent effort with movement of her

extremities.  (Tr. 20; see Tr. 206, 235, 240)  Finally, the ALJ noted that in April 2004,

Plaintiff threatened to hurt herself to avoid incarceration.  (Tr. 20; see Tr. 318)  *Cf. English*,

10 F.3d at 1084 (evidence that a claimant was uncooperative during testing, failed to take

prescribed medication, and was poorly motivated, together with his own testimony regarding

his exertional capacity, amounted to substantial evidence to support the ALJ's findings).

     The ALJ also noted that Plaintiff was not compliant with her physicians'

recommendations.  (Tr. 21)  The ALJ specifically noted that in June 2003, she continued to

use a sling despite being counseled otherwise; in November 2003 it was noted that Plaintiff

had stopped physical therapy; and in April 2004, Dr. Crane released her from his care because

she missed appointments.  (Tr. 21; see Tr.251)  In evaluating the credibility of a Social

Security disability claimant's subjective complaints, an ALJ is not precluded from considering

whether the claimant complied with her prescribed treatment. *See Preston v. Heckler*, 769

F.2d 988, 990 n.1 (4th Cir. 1985) (noncompliance with effective measures provides a basis for

denying benefits); 20 C.F.R § 404.1530 (failure to follow prescribed treatment will result in a

finding of no disability).

The Commissioner also notes that the State agency physicians concluded that Plaintiff was able to perform work within the residual functional capacity found by the ALJ. (Tr. 214-20, 390-96) The ALJ was entitled to rely upon this opinion. By regulation, State agency physicians are expert opinions which the ALJ must consider. *See* 20 C.F.R. § 404.1527(f)(2); *see also Perales*, 402 U.S. at 408; *Hunter v. Sullivan* 993 F.2d 31, 35 (4th Cir. 1992) (an ALJ may properly give significant weight to an assessment from a non-treating physician); *see also Craig*, 76 F.3d at 591-596; *Mickles*, 29 F.3d 921; SSR 96-6p (findings made by State agency physicians must be treated as expert opinion evidence).

In assessing Plaintiff's residual functional capacity, the ALJ considered, but gave little weight to the opinions that Plaintiff was disabled because they were not supported by the evidence of the record as a whole. (Tr. 21) *See Morgan v. Barnhart*, 142 Fed.Appx. 716, 722 (4th Cir. 2005) (unpublished) (ALJ must evaluate all evidence in the case record to determine the extent to which the treating physician's legal conclusion is supported by the record); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1983) (the treating physician rule does not require that the testimony of a treating physician be given controlling weight). Further, the ALJ found that the treating physicians' opinions were entitled to little weight because they were based upon Plaintiff's subjective complaints, which the ALJ found were not credible. *See, e.g., Johnson v. Barnhart*, 434 F.3d 650, 657 (4th Cir. 2005) (physician's opinion that was based on the claimant's subjective complaints could be rejected); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (fact that physician's diagnosis was based largely upon

Page 24 of 28

claimant's self-reported symptoms allowed ALJ to assign that physician's opinion lesser weight); see also 20 C.F.R. § 404.1546(c) (residual functional capacity determinations are the responsibility of the ALJ). In any case, as the Commissioner correctly points out, these opinions were of little evidentiary value because they reflected Plaintiff's condition more than two years after November 2003, when the Commissioner found Plaintiff's disability ceased. The ALJ specifically identified the evidence supporting his reasons for according little weight to the opinions. The ALJ noted that the March 2006 opinion (Tr. 430) was not supported by the record (Tr. 21) and there were no treatment notes. Furthermore, although the physician claimed that Plaintiff had been hospitalized for back pain, there was no evidence supporting this assertion in the record. The ALJ also noted that the physician's opinion regarding Plaintiff's mental health conflicted with Dr. Kirby's opinion that Plaintiff did not suffer from a psychiatric illness. (Tr. 21; see Tr. 318) He deduced that the physician relied on Plaintiff's subjective complaints, which the ALJ found were not reliable. (Tr. 21).

The ALJ also gave little weight to Dr. Wilson's opinion. (Tr. 21) He noted that Dr. Wilson wrote that Plaintiff had undergone surgery, but did not say when that surgery had occurred. (Tr. 21) He also noted the record did not contain documentation of the surgical procedures that Dr. Wilson referenced. (Tr. 21; see Tr. 431) Furthermore, he noted that the medical records reflected minimal spinal injuries that were unlikely to require surgery. (Tr. 21; see Tr. 182, 201, 232, 351, 354-56, 358-60, 385) In addition, the ALJ noted that Dr. Wilson had refused to provide narcotic pain medication in February 2004, because Plaintiff

was very manipulative.  (Tr. 21; see Tr. 231)  The lack of corroborating evidence in the record provided substantial support for discounting Dr. Wilson's opinion.

Moreover, the ALJ deduced that Dr. Wilson, like the other physician, relied on Plaintiff's subjective complaints, which the ALJ found were not reliable.  (Tr. 21)  In summary, the ALJ properly considered inconsistencies between Plaintiff's testimony and other evidence of record in evaluating the credibility of Plaintiff's subjective complaints.  *See Hunter*, 993 at 33.  The ALJ properly considered the entire record, including objective and subjective evidence, in concluding that the Plaintiff's disability had ceased.

Because Plaintiff was unable to perform her past relevant work, the burden shifted to the Commissioner to determine if there were a significant number of jobs in existence in the regional or national economy Plaintiff could perform, considering her age, education and residual functional capacity.  *See McLain v. Schweiker*, 715 F.2d 866, 868-869 (4th Cir. 1983); *Hall v.Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).  In making a determination at step five of the sequential evaluation, the Commissioner is guided by the Medical Vocational Guidelines provided in 20 C.F.R. pt. 404, subpt. P, app. 2.  To apply these regulations, findings as to the claimant's residual functional capacity, age, education and work skills are made to determine her profile.  If the profile matches one of the rules set out in the tables in app. 2, the rule indicates whether or not the claimant is disabled.  *See* 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(a).  The Fourth Circuit has held that the Medical Vocational Guidelines may be used to direct a finding of either "disabled" or "not disabled" in cases involving

exertional limitations.  *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989).  In this case, the

ALJ found that Plaintiff retained the residual functional capacity to perform sedentary work.

(Tr. 18)  Thus, considering Plaintiff's age of 34, her twelfth-grade education, previous work

experience and residual functional capacity, 20 C.F.R. pt. 404, subpt. P, app. 2, table no. 1, §

201.28 directed a conclusion that Plaintiff was not disabled.  (Tr. 22-23)

     The Court concludes that the ALJ's finding that as of November 2003, Plaintiff

demonstrated medical improvement related to her ability to work, and that she could perform

other work, is correct.  *See* 20 C.F.R. §§ 404.1520(f), 404.1594(a), (b).  The ALJ's decision is

supported by substantial evidence and is a correct application of case law and regulations and

therefore will be upheld by the Court.

## RECOMMENDATION

     Based upon the foregoing, **it is recommended that the Commissioner's decision be
affirmed.**

George C. Kosko
United States Magistrate Judge

November 26, 2007
Charleston, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within ten (10) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail.  Fed. R. Civ. P. 6(a) & (e).  Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
P.O. Box 835
Charleston, South Carolina 29402


**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).